JINKINS v. NOEL.

1. In trespass to try titles, the declaration or verdict must ascertain with reasonable accuracy, and to a common intent, the precise tract or lot recovered; but scrupulous accuracy of description is not necessary.
2. An original contract for the sale of lands, executed by the Secretary of the Treasury of the United States, under the seal of the Treasury department, is sufficiently authenticated by that seal, and is admissible as evidence, without further proof of its execution.
3. A copy of such contract, certified by the Secretary of the Treasury under his hand and the seal of the department, as being a true copy from the records of his office, is likewise admissible as evidence.
4. And it is not a sufficient cause of reversal that the original and copy were both given in evidence to the jury; both being similar, the introduction of the copy could do no injury.
5. The allotments of lands, made to the French emigrants, under the act of Congress passsed the 3d of March, 1817, for the encouragement of the cultivation of the vine and olive, may be assigned by the grantees, as well before as after the performance of the conditions of cultivation required by the government.
6. An alien may purchase and hold lands, before office found; and may maintain an action to recover the possession.
7. Where a plaintiff relies on documentary proof of title, a complete title must be shewn; and if a material link be wanting, his documentary proof should be excluded from the jury.

THIS was a writ of error from the Circuit Court of Greene county. Thomas Noel had instituted an action of trespass to try titles in that Court, against William Jinkins, to recover the possession of a tract of land, and damages for the detention. The declaration charged that the defendant had, with force and arms, broken and entered a close of the plaintiff Noel, described as being "a certain piece or lot of land, containing about 120 acres, and being about one half of a mile in length, north and south; and about three eighths of a mile wide, east and west; and situated in the eastern side of the north east quarter of the section No. 25, in township No. 20, in range 4 east, in Greene county; said close of the said Thomas, being bounded on the east by the eastern line of the said section 25; on the north by the northern line of the said section 25; on the west by part of the said same north east quarter of the said section 25; and on the south by the south east quarter of the said section 25; and being within the four townships of land sold to the French association, by virtue of an act of the Congress of the United States, passed the 3d day of March, 1817." The defendant pleaded the general issue. At September term, 1828, the issue was tried, and a verdict was found for the plaintiff, for the land, and one dollar damages; on which the Court ren-

dered judgment, and ordered a writ of *habere facias pos-*
*sessionem* to issue for the land recovered.

By a bill of exceptions tendered at the trial by Jinkins
the defendant, it is shewn, that the plaintiff, for the purpose
of shewing documentary title in himself, offered as evidence
a paper, purporting to be the original contract, made by W.
H. Crawford, Secretary of the Treasury of the United States,
on the part of the United States, and Charles Villar, agent of
the French emigrant association; whereby, four townships
of land, commonly called "the French grant," were sold to
said association, under the provisions of the act of Con-
gress, passed the 3d of March, 1817, entitled "an act to
set apart and dispose of certain public lands for the encour-
agement of the cultivation of the vine and olive."*    The

---

* NOTE.  The following is a copy of the original contract made between
the Government and the French association above refered to.

Whereas, by virtue of the act of Congress, entitled "An act to set
set apart and dispose of certain public lands, for the encouragement of the
cultivation of the vine and olive," passed on the third day of March, 1817,
the Secretary of the Treasury was required, under the direction of the Pre-
sident of the United States, to designate and set apart, any four contiguous
townships, each six miles square, of vacant public lands, lying in that part
of the Mississippi Territory, now the Territory of Alabama; and was autho-
rized to contract for the sale of the said four townships, at the rate of two
dollars per acre, to be made payable fourteen years after the contract,
which should be concluded with any agent or agents of the late emigrants
from France, who have associated together for the purpose of forming a
settlement in the United States; provided that satisfactory evidence was
produced, that such agent or agents were duly authorized to form such
contract; and that the number of such emigrants being of full age, for which
he or they were authorized to act, were equal at least to the number of
half sections, contained in the four townships, proposed to be disposed of;
and the said Secretary of the Treasury, was further authorized, to make such
allotment of the lands among the individuals aforesaid; to stipulate in the pro-
posed contract, for such conditions of settlement, and for the cultivation of
the vine and other vegetable productions, as might to him appear reasona-
ble.   And whereas, the Secretary of the Treasury, in pursuance of the au-
thority so vested in him, has, under the direction of the President of the
United States, designated and set apart for the purposes intended by the
said act, the four following townships contiguous to each other, in that
portion of the Mississippi Territory, now the Alabama Territory, spe-
cified in the said act, to wit: township eighteen in range three; and town-
ships eighteen, nineteen and twenty in range four; and has established
and confirmed, with certain exceptions, and alterations hereafter stated, the
allotment made by, and among the individuals described in said act, a list
of whom, was deposited in the office of the Treasury department, on the
tenth day of November, 1817; a copy whereof, together with maps of the
allotments so made, are hereunto annexed: And whereas, Charles Villar,
hath appeared and produced satisfactory evidence, that he is duly authori-
zed as agent, by the number required, of such emigrants, to form, and to ac-
cept, on their behalf, the contract authorized for the said four townships.

Now be it known, that I, William H. Crawford, Secretary of the Trea-
sury of the United States, by virtue of the authority aforesaid, and in con-
sideration of the payments to be made, and of the stipulations hereinafter
stated, to be performed by the said association, of individuals, have con-
tracted, and by these presents do contract with the said Charles Villar,
agent as aforesaid, for and in behalf of the emigrants in the said act des-
cribed, and whose names are inscribed in the aforesaid list, deposited in the
office of the Treasury department, and whereof a copy is hereunto annexed,

defendant objected to this document, without proof of its due and legal execution by the respective parties, but the Court admitted it as evidence, on the ground, that its legal execution was sufficiently proved by the seal of the Treasury department of the United States affixed to it. The plaintiff then proved that the land in controversy was part of a tract originally allotted to one Gaines, but by the contract, his name was striken out of the list of allottees, so that the lot was left unappropriated; and for the purpose of proving that it had been afterwards appropriated to one J. Haez, of whom the plaintiff had purchas-

to sell to him and them, the said four townships of land, lying and being in that part of the Mississippi Territory, now the Alabama Territory, to wit: township eighteen in range three, and townships eighteen, nineteen and twenty in range four; he or they paying, or causing to be paid therefor, on or before the eighth day of January, one thousand eight hundred and thirty three, the sum of one hundred and eighty four thousand, three hundred and twenty dollars; and also, he and they faithfully complying with the following conditions and stipulations, that is to say:

First. That before the expiration of three years from the date of this contract, there shall be made upon each tract, in the aforesaid four townships, allotted to the respective associates, a settlement by themselves individually, or by others on their account.

Second. That before the expiration of fourteen years from the date hereof, there shall be cleared and cultivated, within the said four townships, at least ten acres of land, for each quarter section, taken aggregately.

Third. That before the expiration of seven years from the date hereof, there shall be cultivated within the said four townships, at least one acre to each quarter section, taken aggregately, in vines.

Fourth. That before the expiration of seven years from the date hereof, there shall be planted within the said four townships, not less than five hundred olive trees; unless it shall be previously established, to the satisfaction of the President, that the olive cannot be successfully cultivated thereon.

Fifth. That a report shall be made annually, to the Secretary of the Treasury, by the agent of the said association or his successor, shewing the number of settlements made within the said four townships in each year; the progress made in cultivating the vine and olive; and the degree of success with which the same is attended; and describing the number and kinds of such plants, which have been cultivated; and also, that the said agent, or his successor, shall from time to time, furnish to the Secretary of the Treasury, such other information touching the condition and state of the association, as he may require.

Sixth. That the list of associates, deposited in the Treasury as aforesaid, be recognised, and the persons thereon inscribed, confirmed in the allotments of land, annexed to their names respectively, with the exceptions following, viz: Martin Piquet Joseph, Wells and Leclerc, V. M. Garesche, Jacques Braud and John Roster, Jean Thomas Carre, Laurent Faures, Englebert, Samuel Jackson, Joseph Robard, Pierce Freres, Jean Baptiste Neel, William Tablee, Billington, George Gaines, S. Voorhees, Gillaume Montelius, Kimbal, shall be erased therefrom, and Jaques Moncravie, R. A. Terrier, Madame George, Charles Brugiere, Joseph Ducomun, Piere Garesche, G. Bonno, Piere Drouet, Emily, and Conde, be inserted thereon, and be entitled, in the the order in which they stand herein, to the allotments of the persons thus erased, and the allotments annexed to the names of the others of the persons thus erased, shall be assigned to other late emigrants, under such regulations as are hereinafter prescribed.

7th. That such emigrants as are inscribed on the said list, who had, previously to knowing of the allotments assigned to them, respectively settled and improved lands within the said four townships, either in those sections set apart for the small allotments, or in others, and before the first day of

ed, he gave in evidence, a letter written by the Secretary of the Treasury, dated at the Treasury department, on the 11th of January, 1819, and directed to C. Villar, the agent of the association, by which he proposed, that Messrs. Peniere and Meslier should designate the proper persons to whom the allotments made vacant by the erasures made in the list of allottees, should be appropriated, and that the names of such persons, so designated, should be transmitted to the Treasury department for approbation. He then offered in evidence, a paper which was dated the 26th of October, 1819, and which purported to have been sign-

August last past, shall be entitled to hold the same to the extent, and in lieu of the quantity allotted to them respectively, in the large or small allotment, as the case may be; unless the party to whom such land was actually allotted, shall within six months from the date hereof, tender to such settler, the value of the improvements, which he may have made thereon, to be ascertained by two respectable persons under oath; and on failure to make such tender, the party to whom such land was allotted, shall be entitled to the land allotted to such emigrant as aforesaid, to the extent of the allotment so occupied. and improved, or if the same be insufficient, he shall be further indemnified by the assignment of so much land, as will make up the quantity, out of any lands not otherwise appropriated.

Eighth. That the lands exempted from appropriation by the foregoing provisions, may be appropriated to other emigrants from France, not already provided for, and whose names shall be presented to the Secretary of the Treasury for his approbation, by the agent of the association or his successor; but actual settlement shall, in all such cases, be an indispensable condition.

And I, the said William H. Crawford, do further contract and agree, that upon the payment of the above sum of money. and upon the fulfilment of the conditions aforesaid, patents shall be granted to the said individuals or their assigns, for the land to which they may be respectively entitled, under the said act of Congress; but no patent shall be granted for a greater quantity of land, than six hundred and forty acres, for any one person; and no patent shall be granted for any of the land aforesaid, nor shall any title be obtained therefor, either at law or in equity, until full and complete payment shall have been made, for the whole of the said four townships, and until the aforesaid conditions and stipulations, shall have been faithfully complied with and performed, on the part of the aforesaid association.

And the said Charles Villar, agent as aforesaid, for and in behalf of the individuals associated as aforesaid, covenants and agrees, that he and they will pay, or cause to be paid, on or before the aforesaid eighth day of January, of the year eighteen hundred and thirty three, the said sum of one hundred and eighty-four thousand three hundred and twenty dollars; and that he and they will faithfully comply with and perform all the aforesaid conditions and stipulations.

In testimony whereof, I, William H. Crawford, Secretary of the Treasury of the United States, have hereunto set my hand, and caused the seal of the Treasury department to be affixed, and the said Charles Villar hath also set his hand and seal, this eighth day of January, in the year of our Lord one thousand eight hundred and nineteen, and in the forty third year of the independence of the United States of America.

Seal of [L. S] the Treasury    (Signed,) WILLIAM H. CRAWFORD,
Department                    *Secretary of the Treasury.*
                            CHS. VILLAR,
Test:                 *Agent of the French association.*
EDWARD JONES,
EDWARD FOX, Jr.

Appended to this contract, is a list of 347 allotments, with the names of the persons to whom the allotments were made, and the quantity assigned

JULY 1830.

Jinkins
v.
Noel.

ed at the foot by J. A. Peniere and B. Meslier; and by M. Mestayer, P. M. Mannoury, Chs. Prudhomme, and one Metais, as witnesses. This paper was a map of the allotments, on which were written the names erased, and those substituted; shewing the name of Haez inserted on the land sued for, in lieu of the name of Gaines, erased. On this paper the name of Prudhomme also appeared, as one designated to receive an allotment. On the back of this paper, was a probate of it, made before the Judge of the County Court of Mobile county; and also a certificate of its being registered in Greene county. It appeared that Prudhomme resided in Mobile, and that the other subscribing witnesses resided out of the State. The hand writing of Peniere, of Meslier, and of the subscribing witnesses was proved. The defendant objected to the introduction of this paper as evidence, upon the proof offered; but the Court permitted the face of the paper to be read to the jury as evidence. The plaintiff then further offered in evidence a deed of bargain and sale, dated the 1st of December, 1823, made by Haez to the plaintiff, whereby for valuable consideration he conveyed the land in controversy to him, Noel, describing it as a part of the land originally allotted to Gaines. The execution of this deed was duly proved. This deed was also objected to, as inadmissible evidence, but the objection was overruled. The plaintiff also gave in evidence a copy of the contract first above mentioned, certified by the Secretary of the Treasury of the United States, with the seal of the Treasury department affixed, to be a true copy from the records of his office; which copy appeared to be similar in all respects to the original produced; the defendant's objection to this paper was also overruled.

After the plaintiff's counsel had gone through with his evidence, the defendant proved that Noel, the plaintiff, was an alien, that he was born in the island of St. Domingo, where he resided till the year 1810. The counsel for the defendant then requested the Court to instruct the jury that if they beleived from the evidence that the plaintiff was an alien, they must find for the defendant; but

_____

to each. Also maps shewing the land to which each person is entitled. The allotments were of various quantities, from 40 to 480 acres to each individual; besides which, each allottee was to be entitled to a town lot, and a small outlot of from 3 to 12 acres around the scite of the town. The allotments remaining vacant, or unappropriated, were also shewn by the list, amounting to 37 tracts, besides those which became vacant by the erasures made in the contract, and which were not supplied by other names.

the Court refused this instruction, and charged the jury that this defence should have been pleaded in abatement, if available at all; and that under the plea of "not guilty," this objection was not available. The defendant shewed no paper title, nor descent cast.

The errors assigned by Jinkins, the appellant in this Court, are: 1st, that the judgment was erroneous, on account of the uncertainty and insufficiency of the description of the land. 2nd, the matters contained in the bill of exceptions, as to the admission and rejection of evidence, and instructions given by the Court.

VANDEGRAAFF, for the appellant. The first objection we make is, that the description of the land declared for and recovered, is too vague and uncertain, and is therefore insufficient to identify it. I can see no greater reason why a judgment for about 120 acres of land should be sustained, than a judgment in assumpsit for about 120 dollars. There must be certainty, either in the quantity or in the boundaries, else how can the sheriff give possession according to the judgment, and how shall he be protected? Here, the boundaries are as uncertain as the quantity; the land is described as being about a half mile long, and about three eighths of a mile wide; the sheriff cannot know with certainty of what land he is to deliver possession, nor identify it by his precept; he may be justified apparently by his writ, and yet be a trespasser on the land of others. It is said in Buller's Nisi Prius,[a] that "ejectment will not lie of twenty acres of arable and pasture, without shewing how much of each; nor will it lie of a close of meadow called Partridge Lees, containing ten acres, more or less, because the certainty of acres ought to appear in the declaration; nor will it lie for a close containing three acres, without ascertaining whether arable, pasture or meadow." In Virginia, the rule has been adopted that there must be certainty in the description,[b] and in the case of *Gregory v. Jackson*,[c] the rule that the plaintiff was to take possession at his peril, was invoked in vain. For this uncertainty, which runs through the whole of the proceedings, we insist the judgment is erroneous.

The original contract was improperly admitted in evidence. The act of Congress authorized the making of a contract, but does not shew that any was made; that fact must be established by legal evidence, and the legal proof of its execution was insufficient. Let us admit that the

[a] Page 109.

[b] 1 Mun. 174.
[c] Mun. 25 26.

JULY 1830.

Jinkins
v.
Noel.

seal of the treasury department was sufficient proof of the execution of it by the Secretary of the Treasury, what proof have we of its execution by Villar? his signature to it must be established: There were two subscribing witnesses to it; why were they called on if not to be able to prove the signature of Villar, the agent of the emigrants? It purports to be under the hand and seal of both parties; but Villar has affixed no seal to it; why is this? It then appears to be incomplete; its execution by both contracting parties is not legally proved. The appellee endeavored to remedy this deficiency by producing also a certified copy of the contract; but when the original is in the power and possession of a party, he must rely on that; he must produce it with proper and legal proof of its execution. It is no answer to say it could do no harm; we have a right to object to all improper or irrelevant testimony; it tends to mislead a jury, and howsoever immaterial evidence may be, if improper, it is error to suffer it to go to a jury.[a]

*a* 1 Mun. 291.
2 Mun. 174.
Gilb. Ev. 15
16. 1 Stark
ies Ev. 151
152.

The deed from Haez to Noel, was improperly received in evidence, for two reasons: 1st, because Haez had no title to convey; and 2nd, because the title could not be assigned. The documentary title produced, does not shew a title in Haez. By the contract it is established that the piece of land in controversy remained unappropriated, the name of Gaines being erased; it devolved on the plaintiff to shew that it was afterwards appropriated to Haez, and in this the proof fails. The letter of the Secretary of the Treasury, of itself, is insufficient to establish that the allotment was made to him.[b] The paper offered, signed by Peniere and Meslier, was also insufficient to establish the fact. In the first place, it was of itself, too indefinite to be considered evidence of any thing whatever; it could not afford evidence which could be relied on, of any thing definite, it is a non-descript document: Besides, there was no evidence of the approbation of the Secretary of the Treasury of the allotment made to Haez, without which, the evidence of title was not complete. But there is another objection to the admissibility of this paper; it should have been proved by Prudhomme, who was a subscribing witness, and who resided in the State; he was not so interested as to be incompetent as a witness; his interest was only in the question; he had none in the particular land in controversy.[c] According to the rules of evidence this paper should have been rejected.

*b* see the 6th
and 8th articles of the
contract.

*c* 1 Stark. Ev.
51. 1 Phil.
Ev. 35–6.
Note A.

But supposing Haez to have been legally substituted in the place of Gaines, the deed made by Haez should not have been admitted, because the title could not be transferred. From the nature of the contract and act of Congress under which it was made, it is apparent that it was not intended that those lands should be assigned till the conditions were performed by the grantees. Admitting as a general rule, that at common law, a title of that nature may in general be assigned, yet, from the peculiarity of the stipulations of the parties themselves, the grantees are restricted, and cannot transfer. Such a right would be at war with and would destroy numerous provisions of the contract, and the whole object of it would be defeated if assignments were allowed before the conditions were performed. The act required persons of a particular description, and a certain specified number of them; settlements were also required to be made by them. But if they can assign to one another or to strangers, all the objects endeavored to be secured by the stipulations of the law are lost; all the care taken that persons of a particular description only shall participate in the grant, is useless, for any one could be substituted by purchase. The right to assign before the conditions are performed is repugnant to several of the provisions of the contract; 1st, because the act required that there should be as many adult associates as there were half sections in the grant; 2nd, because by the first article of the contract, a settlement is required to be made by the allottee himself, or by some one for his benefit; 3dly, because by the 6th and 8th articles names were stricken out, and no new appropriations were to be made without the consent of the Secretary of the Treasury; the particular persons must be approved; 4th, no patent was to be granted to any one person for more than 640 acres. All these stipulations shew that it was not intended that they should be transferred; for if they could, all these stipulations were useless and could be defeated. I admit that if all the conditions were performed, those lands could be assigned; but not till then.

Another question of much moment is presented; can an alien maintain an action to recover real estate? Noel does not claim as an allottee, but he claims as a general purchaser of land, and he is an alien. Were he even an allottee, I doubt if the question would be altered, for the General Government cannot enable one to hold lands in this State by making a grant to him, if he have not by law capacity

to own it; but that question does not arise here, as Noel is merely a purchaser. An alien cannot maintain an action at law for the recovery of land, because he cannot hold. [a] He may defend a real action, but he cannot prosecute one. [b] I am aware that in New York, the question has been decided against us; but these decisions in New York are against the common law, and also in conflict with the decisions of the United States Courts, and those of Virginia. The cases relied on and referred to in the New York decision do not support it. In the case in 7 Term Reports referred to, the point was not considered. Bacon does not sustain the doctrine; he treats of an alien in possession. The case of an alien in possession is very different, for if he gets possession, he can retain till the State claims. Blackstone and Coke both agree in saying that he cannot hold, though he may purchase; the consequence then is, that his purchase enures to the benefit of the State. It is all sufficient for my purpose that an alien may be put out by the claim of the State. Here the State has a better title than Noel, for when he purchased, the State acquired the title thereby, not he. It will be conceded that after office found, all right of the alien is divested. But the finding of an office does not give title to the State: it is only a proceeding by which the State asserts and recovers its right; then the right must have existed before. It is the same in principle as if the defendant shewed a good title in a stranger, though he had not recovered it by suit. No distinction can be drawn between the two cases. In 1 Bacon[c] it is settled that the King has title against an alien before office found, and that the office is only to put the King in possession. Then we shew a good outstanding title in the State, and this is a sufficient defence in an action of ejectment. In 1 Coke Littleton, 129 b, it is said that the law distinguishes between an alien and an alien enemy; that an alien friend may have personal actions, but that he cannot maintain real or mixed actions. In 9 Wheaton 493, the doctrine for which I contend is expressly recognised. See also 1 Munford 618, 622, 626, Roane's opinion.

It is objected that this defence, if available, should have been pleaded in abatement. But this position is untenable. Alienage may be given in evidence under the general issue, because it is evidence directly attacking the plaintiff's title, and tending to shew that he has in fact none, and he must recover on the strength of his own title; it is also evidence to shew that there is an outstand-

JULY 1830.

Jinkins
v.
Noel.

[a] Coke Litt. 129 b. 310 b. 2 b. Dyer 2 b. 1 Mun. Rep. 611 618 622 626. Esp. Nis. Pr 14. 9 Whea. 496-7

[b] 4 Whea. 453

[c] Pages 133 134.

ing title in the State, and in this point of view good in bar. In assumpsit, under the plea of the general issue, the defendant may give in evidence that the plaintiff is an alien enemy.[a]

STEWART, for the defendant in error. The description of the land in the declaration is as certain as it is possible to make it, unless it be actually surveyed, which the defendant would perhaps not permit to be done; and the description is much more precise than is usual, or is now held to be necessary. Courts no longer adhere to the old rules cited from Buller's Nisi-Prius; the action of ejectment has undergone many changes, and the rule as laid down by all modern authors on this subject is, that the plaintiff takes possession of the land recovered at his peril, and if he takes too much, he is in his turn liable to an action of ejectment; this is, at this day, the well settled doctrine. A verdict in ejectment, as it disposes only of a term, is never conclusive of title, so it never can be pleaded in bar of another action, and therefore the same certainty and precision is never required as in other actions; and as it is found inconvenient in practice, the old rule has been abandoned. Although our form of proceeding is different to recover possession of lands, the law of ejectment is expressly made to govern the action of trespass to try titles, it is only the fictitious forms which are abolished.[b] A description by metes and bounds is sufficient, all the rest of the description may be considered as surplusage.

As to the admissibility of the original contract, it has been expressly settled in this Court, that the seal of the treasury department is a sufficient authentication to make it evidence.[c] The certified copy was also lawful evidence. By an act of Congress passed the 23d of January, 1823,[d] a copy of any paper on file in the treasury department concerning the title of lands, when certified by the Secretary of the Treasury under the seal of the department, is made lawful evidence. So both the original and copy were legal testimony. The copy was not objectionable because it was a copy merely; the statute makes it evidence. But the two contracts, the original and the copy are precisely similar, each corroborates the other. Was it ever heard that a judgment should be reversed when an original paper is produced, because a copy precisely similar is also admitted, when both are lawful

JULY 1830.

Jinkins
v.
Noel.

a 1 Chit. Pl 479. Douglas 649. n. 407 410.

b Esp. N. P. 448. 1 Burr. 629. Wheaton's Selwyn 565. Runn. on Eject. Laws of Ala. 463.

c White v. St. Guirons, Minor's. Ala. Rep. 349.

d 3d Story's Laws of the U. S. 1874.

JULY 1830.

Jinkins
v.
Noel.

evidence? What injury could the defendant suffer? Is a judgment to be reversed because a fact is doubly proved? Would truth and justice be promoted by listening to such a captious reason? Certainly not. Some substantial reason must be shewn before a Court will reverse a judgment which it is to be presumed is in accordance with justice.

The paper signed by Peniere and Meslier was, as we conceive, legally proved. The Court below considered Prudhomme as an incompetent witness, and admitted proof of the hand writing of the makers and witnesses, to establish its genuineness. The allotment was made jointly to Haez and Prudhomme, and was divided between them; we were compelled to shew title against him as to one half of the allotment, and therefore could not properly use him as a witness. It was also proved, in the manner that conveyances are proved under the authority of our statute. *a* It was a paper which operated as a conveyance of land, and was proved on the oath of Prudhomme as a subscribing witness, and admitted to record, as such conveyances are. Under this statute, when a deed is proved and recorded, it is made legal evidence without further proof. So, if this document could be proved by the oath of Prudhomme, it was so proved.

It is said the deed from Haez to Noel was improperly admitted, because the title was not assignable. The argument is certainly badly sustained when the counsel are compelled to admit that a title of the nature of the one claimed is assignable by the rules of the common law. How else is its assignable quality to be tested but by applying the rules of the common law, and comparing it to titles that are of a similar nature? It is then a right or interest in land, depending on conditions; but upon the performance of the conditions, the title was to become perfect. Then it is an interest, though subject to a contingency. Any interest in land or other thing of value is by law transferable; any certain right can be assigned. It is only bare naked possibilities which cannot be assigned; and even a possibility coupled with an interest, is sometimes assignable. *b* A claim on a foreign government, not acknowledged, is transferable, though there be no legal remedy to enforce such right. *c* The interest in a policy of insurance may be assigned, though it be certainly a very contingent interest. *d* Courts of common law now hold choses in action to a great extent assigna-

*a* Laws of Ala. 234, Sec. 1.

*b* Shep. Touch 238. 1 Bridg. Dig. 88. 1 Com. Dig. 688 1 Cranch 423

*c* 1 Pet. Rep. 213.

*d* 8 Whea. 268

ble. *a* Then such title is clearly assignable from its nature and the rules of law.  It is said however that by the contract itself it is restricted, and the assignability destroyed.  It seems hard to conceive that an interest from its nature and qualities and the rules of law shall be assignable, and yet that it is not so.  But to answer at once all the arguments relied on to shew that it was the intention of the contracting parties to restrain the assignability, it is only necessary to look to the contract itself, where it is expressly provided that patents shall be granted to the allottees "or their assigns," shewing expressly that assignments were contemplated by the contracting parties.  There is no incompatibility whatever between the right to assign and the several conditions of the contract.

Another objection made to the admissibility of the deed of Haez is, that he had no title to convey.  That objection is out of place.  A party certainly must be permitted to go on and prove documentary title if he can, and to prove as many links of his title as he is able, beginning at which end he thinks proper; and if all the documents are relevant and properly proved, there can be no error.  There would be error if the Court instructed the jury that a title was good, where a link was in fact wanting; but can the appellant pretend to say that the Court did instruct the jury that the plaintiff had made out a paper title? Did the plaintiff below recover on his paper title, when it is clear and never was denied but that the documentary title had failed?  There can be no expression found in the bill of exceptions to shew that the evidence set out in it was all the evidence on which the plaintiff relied, and on which he recovered.  In point of fact, after the plaintiff below had failed in establishing his paper title, he then relied on parol evidence establishing an anterior possession by him, and that the defendant trespassed on his possession.  To this, and the charge of the Court on that part of the proof, which was that on which the recovery was in fact had, no exception was taken.  The appellant spread on his bill of exceptions only such matters as he thought proper to except to, as he had a right to do; but it is not shewn that the evidence there set out was all that was introduced, nor that the jury were instructed by the Court that the papers shewed a good title in the plaintiff: certainly the Court would not intend that this was the case.  All the legal presumptions are in favor of the correctness of

JULY 1830

Jinkins
v.
Noel.

*a* 1 Whea. 236.

the decision below, and the appellant has no right to assume such a position on his own bill of exceptions, after he has omitted to insert in it all he chose to omit.

The only remaining question is as to the right of an alien to maintain an action for the recovery of lands. The question is certainly important, but will hardly admit of argument at this day. It is well settled in the United States, that before office found, an alien may maintain ejectment. In this country of liberal institutions, a policy more narrow than that of England would scarcely be tolerated; and even there, the doctrine contended for would not now prevail. To sustain the right of an alien to purchase, to hold and to recover, we rely on a well supported train of concurring authorities. [a] Even where a title is acquired during alienage, a subsequent naturalization will relate back so as to make the title perfect from the commencement.

It is unnecessary to consider whether the objection of alienage was proper in bar or in abatement, as the objection is not available at all. The general rule however is, that any personal disability of the plaintiff must be pleaded in abatement, else it might operate as a surprize.

*a* 1 Com. Dig. 559.
3 Johns Cases 112, 109.
11 Whea. 351 to 357.
1 Mass R. 256
7 Cranch 603
3 Whea. 563.
8 Mass. R. 430
12 ib. 143.
1 Bac. Abr. title alien.
title abatement.
2 Kents Com. 43.
10 Wheaton.
9 ib. 3 ib.

GAYLE, in conclusion. It is not denied that in general when a legal estate has been granted, it may be assigned. But this is a contract made under peculiar circumstances and for a particular purpose, and it must be construed so as to carry into effect the object which induced the government to make it. It is no doubt true that the government intended to grant a favor to the French emigrants, but we must look to the enactment and the contract as it is made, and expound it accordingly. The leading object then as expressed, appears to be to introduce the culture of the Vine and Olive; to effect this, the grant is made to a particular description of individuals, natives of the country where those articles are produced, and who are presumed to be acquainted with the proper mode of cultivating them. We see that by the act, the precaution is even used of requiring a number of persons of the particular description equal to the number of half sections, of full age, evidently for the purpose of securing a full experiment. But allow those persons to transfer their allotments to our own citizens, and is not the whole object at once destroyed, and are not all the careful stipulations of the government entirely defeated? Suppose a wealthy

person should purchase the whole grant, what reasonable prospect would there be that the object of the government would be accomplished? If this is the case, an unqualified right to assign cannot be admitted; for the leading and principal object of the grant must not be defeated. We must then admit a right to assign only after the conditions of cultivation have been performed; this construction will reconcile all the parts of the contract, and therefore is the only true construction.

No satisfactory answer has been given to the objection as to the uncertainty in the verdict and judgment. It is true, a defect for uncertainty in the declaration may be cured by the verdict; but here the verdict is general, and as uncertain as the judgment. It is said that if the Sheriff delivers too much, the party takes it at his peril. That rule does not apply; if there were two tracts answering the same description, then it would be applicable. But that is the old argument and is not the doctrine at this day. Certainty is required, else why not carry the argument out, and let the Sheriff deliver possession without a trial, and let the plaintiff take it at his peril; the argument will go that far. The cases cited in 1 Munford, shew the true doctrine. The authority cited is uncontradicted, that a declaration for 20 acres more or less, is bad. There is more certainty in such a description than there is in this case; the word *about* is entirely indefinite, it is not a legal term, and has no definite meaning, but conveys in itself an idea of uncertainty. There must be something definite sued for, and it must be described either by quantity, or by metes and bounds.

The objection to the admissibility of the original contract is not removed. It was the act of two parties, and its execution by Villar must be established as well as that by the Secretary of the Treasury. Suppose the government brought an action on the contract, would the production of it be sufficient proof that it was executed by Villar? Certainly not; the rule here cannot be different; it must be established by legal evidence. Though the copy may have been duly authenticated under the act of Congress, it could avail nothing, because the original was relied on, and the copy was only secondary. The plaintiff should have been confined to the original, and failing to establish that, there was no legal proof of the contract.

There was clearly error in the omission to prove the paper to which Prudhomme was a witness, by his evi-

dence. He was within the State, and could be produced: his interest is in no way shewn, and the paper not being a deed, does not come within the statute relied on.

In relation to the right of an alien to hold lands in this State, as this is the first case involving the question, it is important to investigate it properly and settle it correctly. I shall not attempt to controvert what Kent has said on the matter, except by shewing what other authors of great respectability have said on the same subject. The ques tion seems to have been settled since the time of Little- ton, and we find no late English authorities disturbing it. because probably the law was considered too well settled to admit litigation. Let us then endeavor to arrive at the proper construction of what Littleton and Coke did say. They say that an alien may take by purchase, but cannot hold. The meaning of this is, that the purchase is good and complete to divest the title from the vendor, but that by the purchase it vests in the King, for the alien cannot hold. This construction is confirmed in another passage, where we find it laid down that an alien cannot maintain a real nor a mixed action, though an alien friend may have a personal action. This is the true construction. Mr. Stewart attempts to distinguish between the right of the King before, and after office found; but it is the fact of the purchase which gives the King title, and the office is only a suit to recover the right. The cases cited from Whea- ton do not expressly decide the point, and they admit the *dicta*, that an alien cannot maintain a real action. It is true that in Massachusetts and New York, decisions have been made adverse to our position; but we are not bound by those decisions, and should look well to the principle before we adopt it. The authorities relied on in those decisions do not support them, and do not apply; we are certainly not guilty of presumption in controverting them when we have such authority to rely on as Coke and Ba con. We should not suffer such authorities to be slightly overturned.

*a* 10 Johns.467
2 Sel. 110.

Alienage is a good defence in ejectment under the ge- neral issue. *a*

By JUDGE SAFFOLD. It is assigned for error, 1st. That the verdict and judgment are erroneous for their un- certainty in describing the land recovered. The alleged uncertainty, is explained in argument to refer to the terms adopted to express the quantity of land intended to be

JULY 1830.

Jinkins
v.
Noel.

conveyed, and in its dimentions north and south, and east and west, by describing it as containing "about" the number of acres; and being "about" the extent mentioned, instead of a more exact description; and in only describing the western boundary as being part of the said north-east quarter of the said section 25. By an authority referred to, [a] it is held that "ejectment will not lie of 20 acres of arable and pasture, without shewing how much of each; nor will it lie of a close of meadow called Partridge Lees, containing 10 acres more or less, because the certainty of acres ought to appear in the declaration; nor will it lie for a close containing three acres, without ascertaining whether arable, meadow, or pasture." In support of the judgment, reference has also been made to authority, [b] where it was ruled "that a very exact description of the nature of the land is not required, and that a greater latitude is now admitted than formerly, because the lessor of the plaintiff is to shew the lands to the Sheriff and to take possession of them at his peril." Also, it is said to be usual for the plaintiff to indemnify the Sheriff, and then the Sheriff gives him execution of what he demands. And if the plaintiff takes out execution for more than the recovery warrants, the Court will interpose in a summary way, and restore the tenant to the possession of such part as was not recovered. [c] I am of opinion, however, that all reasonable and practicable certainty of description should be required, and that the correct rule of law does not permit a successful plaintiff, by indemnifying the Sheriff or otherwise, to exercise an arbitrary discretion as to the quantity, or particular location of the lands to be delivered under his recovery; but that the verdict and judgment must ascertain, to a common intent the precise lot or tract recovered, and that this must appear either in the verdict and judgment, or by the usual reference to the declaration.

The further inquiry on this point is, does this record contain the requisite certainty? The method adopted by the Federal Government for dividing out the public domain into townships and sections, and the allotment of sections into less subdivisions, is known from the public laws. This is done preparatory to the sale or other appropriation of them. It is a fact of universal notoriety, and unavoidable in its nature, that the different townships and sections, though intended to be of the same dimentions, and so surveyed as nearly as practicable, vary con-

[a] Bul. N. P. 109.

[b] Esp. N. P. 448.
1 Bun. 629.

[c] See Wheat. Sel. 565, and references.

JULY 1830.

Jinkins
v.
Noel.

siderably in quantity; so that sections intended to be made tracts of 640 acres, often vary from that quantity, by an excess or diminution of 20 acres; and are disposed of by the government at what appears from surveys to be the true contents. A section however, in common parlance, is understood to contain 640 acres, and each subdivision a proportional quantity. The sections being divided into quarters by two right lines, through their centre, intersecting each other at right angles, would leave 160 acres to each quarter, provided the sections contained the exact quantity of 640 acres. But the division of the sections not having been actually made by the authority of the United States, individuals are left to purchase the subdivisions as though it had been done, and must themselves ascertain the precise bounds of the smaller allotments by such legal means as are provided by the laws of the State.

In as much then as the different allotments of the public lands sold to the French association, as well as those in most other parts of the State, must vary in quantity, it was difficult or impossible for the defendant in error, without an actual survey, to ascertain the exact quantity or dimensions of the land sued for. From the description of the land given in the declaration, it is perfectly evident, that Noel claims, and attempted to describe three eighths of the north half of section No. 25, and that to be taken from the east side of the said half section. His description contained reasonable certainty; the lot or tract may not be precisely, but must be near the quanty and dimensions he gives. It is therefore sufficient to say "about" so much, at least when accompanied with definite bounds on the north, east and south, and when described as being bounded on the west by part, which must be the residue, of the said north-east quarter of said section No. 25.

2. As to the second assignment of error, all may be embraced which imputes error in the admission by the Court, as evidence, of the paper purporting to be the original contract between the Secretary of the Treasury of the United States, and Charles Villar as agent of the association of French emigrants, and also the admission of the copy thereof.

The original contract objected to, is the same that was tested as evidence in the case of *White v. Saint Guirons,*[a] with the principles of that decision, the Court feel no dissatisfaction. It was, that the seal of the Treasury department of the United States, and the signature of the

*a* Minor's Reports 331.

Secretary, are intrinsically evidence to authenticate the official acts of the Secretary. But the objection relates particularly to the absence of proof of the execution of the contract, by Villar the agent. That Villar was the agent he purports to have been, is not questioned; and he is acknowledged as such, by the United States, in the supplemental act of Congress in favor of the emigrants. The allottees claim no title as having been derived from him, but from the United States, through the Treasury department. Therefore authentication of the contract by the Secretary, executed pursuant to an act of Congress with the agent of the emigrants or allottees, and for their benefit, is sufficient to entitle them to use it as evidence. That the original contract being in the possession of the party, was admissible as evidence, at least equal to the copy, it is impossible to doubt. The copy which was certified by the Secretary of the Treasury, with the seal of the Treasury department, to be a true copy from the records of his office, and which is in all respects similar to the original, is conceived to have been entirely innocent. It could have produced no injury, and though unnecessary, as the jury would have been bound to give the same credit to the original alone, that they could to both, there could be no error in admitting it as evidence.

3. Under the next assignment of error, will be noticed the objection that the French emigrants or allottees were incapable of assigning their interest; and that the Court below refused to instruct the jury, that if they believed the plaintiff below was an alien, they ought to find for the defendant.

It is admitted with respect to the first branch of this exception, that an inchoate title to lands, as well as one more complete, by the principles of the common law, may be assigned. But it is contended that the spirit and design of this contract, necessarily restrain alienation by implication. That as its object was "to set apart, and dispose of certain public lands for the cultivation of the Vine and Olive," and the French emigrants were supposed to be peculiarly fitted for the enterprise, the right of alienation by them would defeat the purposes of the grant. By the act of Congress of the 3rd of March 1817, the Secretary of the Treasury was authorised, under the direction of the President, among other duties, to make allottments of the lands among the individual emigrants, to stipulate in the proposed contract, for such conditions of settlement,

JULY 1830.

Jinkins
v.
Noel.

and for the cultivation of the Vine and other vegetable productions, as might to him appear reasonable.  Pursuant to this authority, the Secretary did establish and confirm, with certain exceptions, and alterations, the allotments which had been made by and among the individuals described in said act, a list of whose names was deposited in the office of the Treasury department, and a copy whereof, together with maps of the allottments so made, was annexed to the contract, so as to form a part thereof.

It was further contracted between the Secretary and the agent of the allotees, that on payment being made, and the fulfilment of the other conditions prescribed in the contract, patents should be granted to the respective individuals, or their assigns, for lands to which they might be entitled, under the act of Congress; but that no patent should be granted for a greater quantity of land than 640 acres for any one person; nor should any patent be granted for any of the land, or any title be obtained therefor either in law or equity, until payment was made, and all the other conditions were complied with and performed. Doubtless the United States posseses the right, and in several instances has exercised it, of rejecting the names of such persons claiming allotments, as come not within the description of French emigrants.  But it has not been discovered or shewn, that either the law or the contract have restrained alienations of the claims or interest in the respective allotments, either in their incipient state, or afterwards.   On the contrary it is seen that after the conditions shall have been performed, the United States has stipulated to grant patents to the respective individuals, or their assigns.   Patents can never be rightfully claimed until the conditions precedent have been complied with, yet we have no authority to say that any claim of an assignee will then be rejected on the ground of the transfer, or that an assignee shall not have the full benefit of his contract until denied by the government.

The second branch of this exception is, that an alien is incapable of maintaining an action to recover real estate. This is a question of the utmost importance, whether considered with reference to this controversy, or to its influence on the principles of civil liberty, and national policy. Its importance, however, is entitled to no other influence on the Court, than to strengthen their desire to decide it according to the best established principles of law.   The

decision depends on the rules of the common law, as they are understood at the present day.

On the part of the plaintiff in error it is contended, that though an alien may purchase lands, he cannot hold them; consequently he cannot, in any form, maintain an action for their recovery. Some of the authorities referred to by the counsel, afford some sanction to this doctrine. Among others may be noticed 2 Blackston's Commentaries [a] where it is said "if he (the King) grants land to an alien, it operates nothing."

*a* Page 347-8.

It also appears to have been held that an alien could not maintain a real action for the recovery of lands; but that it did not then follow that he might not defend, in a real action, his title to lands against all persons but the sovereign. [b]

*b* Co. Litt. 129
b. 1 Mun.618.

In support of the contrary doctrine we are also referred to many authorities. Judge Kent [c] says "an alien cannot acquire a title to real property by descent, or created by other mere operation of law. The law *quæ nihil frustra*, never casts the freehold upon an alien heir who cannot keep it. This is a well settled principle of the common law; it is understood to be a general rule, that even a natural born subject cannot take by representation from an alien, because the alien has no inheritable blood, through which a title can be deduced. If an alien purchase land, or if land be devised to him, the general rule is, that in these cases, he may take and hold, until an inquest of office has been had."

*c* 2 Com. 46.

Also in the case of *Jackson v. Sunn*,[d] the Supreme Court of New York held, that in case of a purchase, the law will recognize the title of an alien in land, until office found; but in case of a descent, the law takes no notice of an alien heir, on whom the inheritance can not be cast. In the decision of that case, Radcliff J. remarks, "I apprehend it is not true, with respect to aliens in general, that they cannot purchase or hold lands, under any circumstances. On the contrary it appears to have been settled from the time of Lord Coke, that an alien may take by purchase, and even maintain an action for land, if the crown in England, or the people here, do not interfere." In 1 Johnson's cases 399, as well as in the later decisions, the same doctrine is held, and in that State the principle is well settled. The Supreme Court of Massachusetts, in *Sheaffe v. O'Neal*,[e] held unanimously, "that an alien could purchase and hold real estate against all, except the Commonwealth, and could be divested only by office found; of course until

*d* 3 John. Cases 109.

*e* 1 Mass.Rep. 256.

JULY 1830.

Jinkins
v.
Noel.

a 8 Mass. Reports 430.
12 idem 143.

b 7 Cranch 603.

c 1 Bac. Abr. alien c. p.133

d 5 Co. 22.

e Park's Rep. 267, ib 144. Hob. 231. Bro.Denizen pl 17. Co. Litt. 2 b.

f 11 Wheaton 351.

office found, he could convey." This doctrine has become entirely current in that State. a    It also prevails in most of the other States.

This is a question on which the decisions of the Supreme Court of the United States are more particularly entitled to the respect of the State tribunals, for the reason, that the right in question, as well as the titles to lands in this State and several others, in most instances emanate from that source. On a slight review of the decisions of that Court, it will be found, that it sustains the right of aliens to acquire lands by purchase; to hold them, and institute suit for their recovery, unless the sovereignty interpose, by instituting an inquest, and effecting what is called an office found. In the case of *Fairfax's Devisee v. Hunter's Lessee* b it was ruled that even an alien enemy may take lands in Virginia by devise, and hold the same until office found. In delivering the opinion of the Court in that case, Story J. remarked, "if we are right in the position that the capacity of an alien enemy does not differ in this respect from an alien friend, it will not be easy to maintain the disability of aliens to purchase and hold lands. It is incontrovertibly settled upon the fullest authority, that the title acquired by an alien by purchase, is not divested until office found. The principle is founded upon the ground, that as the freehold is in the alien, and he is tenant to the lord of whom the lands are holden, it cannot be divested out of him, but by some notorious act; by which it may appear that the freehold is in another. c Now an office of entitling is necessary to give this notoriety, and fix the title in the sovereign. So it was adjudged in Page's case d and has been uniformly recognized. e And the reason for the difference why when an alien dies, the sovereign is seized without office found, is, because otherwise the freehold would be in abeyance, as an alien cannot have any inheritable blood."

Again in the case of *Governeur's heirs v. Roberson,* f the same Court, in an opinion delivered by Johnson J., to which there was no dissent, held that an alien may take real property by grant, whether from the State, or a private citizen, and may hold the same, until his title is divested by an inquest of office, or some equivalent proceedings. The Court remarks, with reference to the language used by Blackstone, "that if the King grants lands to an alien, it operates nothing," that it would be doing injustice to the writer not to weigh his meaning by the

words preceeding and following this sentence. His language is this, "but the King's grant shall not enure to any other intent than that which is precisely expressed in the grant. As if he grants land to an alien, it operates nothing; for such grant shall not also enure to make him a denizen, that so he may be capable of taking by grant." The Court proceeded to declare the true principle thus, "that an alien can take by deed, and can hold until office found, must now be regarded as a positive rule of law, so well established, that the reason of the rule is little more than a subject for the antiquary." Hence it appears the law on this subject is now too firmly settled to be further questioned; and that it is settled in the way most congenial to the spirit of our institutions, at least in relation to alien friends, to whom we delight to afford an asylum.

4. The two remaining exceptions may be blended, as the last point involved in the case. It is objected that the Court permitted the paper, containing a drawing of lines, a list of names, &c., bearing date October 26, 1819, as set forth in the bill of exceptions, and also the deed from John Hacz to the plaintiff below, to be read to the jury as evidence.

Noel claims to derive title through Hacz to part of a tract of land which had been allotted to Gaines, whose name in the contract mentioned as having been executed between the Secretary of the Treasury and Villar the agent, with many others, had been erased from the list of allottees. In lieu of several allottees whose names had been rejected, several other persons were designated in the contract as their successors. Other allotments thus remaining vacant, it was agreed they should be assigned to other late emigrants, subject however to the regulation, that their names should be presented to the Secretary of the Treasury for his approbation, by the agent of the association or his successor; but that actual settlement should in all cases be an indispensable condition. Authority subsequently given by the Secretary, in the form of a letter, dated January 11, 1819, to the agent, directed that Messrs. Peniere and Meslier should designate the persons to whom the allotments should be assigned according to the terms of the contract; and it was further directed that should these persons disagree as to the persons who ought to be provided for out of said allotments, they might either appoint a third associate, or determine the selection by lot. But the names selected were to be transmitted to

11

JULY 1830.

Jinkins
v.
Noel.

the Treasury department for the approbation of the Secretary. Haez, who appears to have assigned to Noel, the plaintiff below, claims to have derived his interest by virtue of this latter allotment by Peniere and Meslier. The evidence which Noel gave of this title, consists only of the paper of October 26, 1819, appropriately styled in argument a non-descript. It is a paper containing a draft of several allotments of land, with their contents and numbers accompanied with a list of names, and a description of allotments set opposite thereto. This document exhibits the names of Prudhomme and Haez, opposite allotment number 5, of 240 acres, and purports to have been signed by Peniere and Meslier, as makers, and Mestayer, Prudhomme, Mannoury and Metais as witnesses. It also purports to have been proven by said Prudhomme in the usual form of a deed, before William Hale, as Judge of the County Court of Mobile. This probate, however, appears to have been excluded from the jury, consequently it is not in question. The execution of the paper is stated to have been proven in no other way than by making proof of the hand writing of the several persons whose names as makers and witnesses, appear signed at the foot of it. There was evidence that Prudhomme resided in Mobile, and the other persons whose names were subscribed at the bottom, in New Orleans. After objection by the counsel of Jinkins, the defendant below, the Court admitted this paper, and a deed for the land from Haez to Noel, duly proven, to be given as evidence to the jury. On this point it is thought sufficient to observe, that this new allotment is deemed insufficient to vest in Haez any title that could authorize him to sustain an action in his own name, or to transfer an interest to another on which a recovery can be had, until the allotments thereby made shall have received the sanction of the Treasury department. Proof of this fact appears not to have been made, which was indispensable by the terms of the contract. It is unimportant to examine the admissibility, as evidence, of the deed from Haez to Noel.

Much is due to the discretion of the Court of original jurisdiction, as to the particular order in which the several links composing the chain of title shall be introduced, provided it be rendered complete. To commence at the source and trace the title, by regular conveyances, to the plaintiff, would appear to be the most natural order; but various circumstances may excuse a departure from this course.

On the former ground alone, that Haez's evidence of title was inadmissible, we are unanimous in opinion, that there was error, for which the judgment below must be reversed, and the cause remanded.

By JUDGE CRENSHAW. In this case I shall take notice of the objections made to the judgment of the Circuit Court, in the order pursued by the counsel for the plaintiff in error.

The first proposition contended for was, that the description of the premises sued for, was too uncertain to sustain the judgment; that the judgment and verdict refers back to the declaration for a description, and that the land is then described as being a tract, "containing about 120 acres, and about half a mile long north and south, and about three-eights of a mile wide east and west, and situated on the eastern side of the N. E. quarter of section No. 25, township No. 20, range 4, east." From this description it appears that three of the boundary lines are given, but the length of two of them is undefined and the quantity of land is left uncertain. If the metes and bounds had been distinctly and definitely set out, then certainty as to the quantity would be immaterial. But certainty as to quantity would aid an imperfect description, provided the land be sufficiently identified. If the land had been described accurately in the verdict, this would have cured the imperfect description contained in the declaration; for I hold that the land must be described with certainty, either in the verdict, or declaration, and that when the quantity and description are both uncertain, as in the present case, the judgment is clearly erroneous.

From the authorities which I have considered with some deliberation, I infer that the land should be described with that certainty, which will place its identification beyond a doubt; with such certainty that a verdict might be pleaded in bar to another action for the same premises; and with so much certainty as would enable the Sheriff to know of what land he was to give the plaintiff possession. As a judgment imports absolute verity, it is essential to its validity that it be equally certain, and it ought not to require extrinsic aid nor any further act of the party to give it force and effect.

The second position was, that the contract made by the Secretary of the Treasury, under the seal of the Treasury department, with Villar, the agent of the French colony,

JULY 1830.

Jinkins
v.
Noel.

was not proved.   I concur with the Court in believing that the adjucation in the case of *White v. St. Guirons* is decisive of this question.   It was then decided that the seal of the Treasury department, with the signature of the Secretary, are intrinsically evidence to authenticate the official acts of the Secretary.   After the original contract was introduced to the jury, it was certainly unnecessary to offer a copy in evidence.   But the copy being immaterial testimony, after the original was introduced, it could not mislead the jury, and therefore should not now be considered as erroneous.

The third position relied on, was, that there was no proof of title in Haez, and who consequently had no right which he could legally convey to Noel the plaintiff.   The evidence going to shew title in Haez is what was emphatically and correctly called by the counsel, a non-descript paper, and which no doubt was intended to be a very material link in the chain of title; but it appears not to be connected therewith by sufficient testimony.   There is no sufficient evidence to prove that Haez was substituted in place of Gaines, or that the land in dispute was allotted to him, under the provisions of the contract, and in pursuance of the instructions of the Secretary of the Treasury.   These material facts cannot be inferred from the face of this non-descript paper.   On this ground therefore I concur with the Court in reversing the judgment.

But two other propositions were assumed, which if true, must effect an entire reversal of the case, and defeat the plaintiff's claim for ever.   The one was that if Haez was a grantee under the contract, yet his interest was not assignable before the annexed conditions should be performed. The other was that the plaintiff Noel was an alien, and could not maintain an action for the recovery of land.

As to the first proposition, it will be recollected that the main object of the government, in granting four townships of land to the French emigrants, was to encourage the cultivation of the Vine and Olive.   It was supposed by the government, that these emigrants coming from a soil and climate which were congenial to the growth of the grape, these branches of agriculture would flourish under their better skill and experience.   In order to advance the principal object of the grant, many inducements were held out, and favors conferred.   The selection was made from the most valuable lands in the country.   To each member of the association was granted a half section, and

the long credit of 14 years was given, in which to make
payment, though the purchase was at two dollars per acre,
the then minimum price of the public lands. These were
certainly greater favors than the government then or at
any time since has extended to her native citizens.

When the conditions annexed to the grant shall have
been performed, the government then covenants to give
a patent to the grantees or their assigns; but it is expressly
declared that no title, either in law or equity, shall be ob-
tained until full and complete payment shall have been
made, and the conditions and stipulations faithfully per-
formed.

I will not inquire whether such an interest in land could
be assigned at the common law.   It is enough for my pur-
pose, if from the object of the grant, the spirit and mean-
ing of the contract, and conditions annexed, an inability to
assign can be fairly deduced.   If the grantee had no title
in law or equity, then he had nothing which could be as-
signed, so as to enable the assignee to maintain a legal ac-
tion.   If the right of assignment existed at all, it must
have been as perfect immediately after the making of the
contract, and the allotment of the land, as now.   And if
so, the grantees might have assigned to persons, who were
not emigrants from France, and who knew nothing about
the culture of the Vine and the Olive, and thus would
have totally defeated the object of the grant in its incep-
tion.   When the conditions and stipulations annexed to
the contract were performed, then and not till then, they
were authorized to assign, because then the object of the
grant would have been attained, and the grantees would
have acquired something like an assignable title.   That
the conditions have not been performed is a fact of pub-
lic notoriety, and may be considered as a part of the his-
tory of the country.   Indeed the time has not yet arri-
ved, when the payment is to be completed.   But I will
not resort to public notoriety to maintain a legal proposi-
tion.   I insist that if an assignee, who must be viewed as
a stranger to the original contract, had a right to maintain
the action before the grant of a patent, it was incumbent
on him to prove at the trial, that the conditions had
been performed.   In the case of *White v. St. Guirons,*
as I understand it, the action was brought by a grantee,
party to the contract, who stands in a very different situ-
ation from an assignee; and for this reason, it was deter-
mined, that his claim ought to prevail against all persons

except the government, and that a mere trespasser had no right to require of him proof that the conditions of the grant had been performed. On the ground therefore, that the interest in the land could not be assigned to the plaintiff, I am for reversing the judgment.

As to the last proposition, which was that the alienage of the plaintiff was a good defence under the general issue of not guilty, it is laid down in many authorities on the subject, that alienage of the plaintiff is an available defence in bar to an action for the recovery of land; and the authorities further maintain, that what constitutes a good bar at the commencement of this action, is admissible in evidence on the trial of the general issue. The question then to be settled is at what time would alienage constitute a good defence. Is it before or after the inquest of office hath been found against the alien? Though with us it may be said to be novel and difficult, yet on a careful examination of the law, and especially the decisions in Massachusetts and New York, and the doctrine as laid down by Chancellor Kent, I am inclined to think it well settled, that an alien in possession of land may defend against all persons except the government, or its grantee; that an alien cannot claim by inheritance, but that he may purchase and hold land; sue for and recover it, at any time before inquisition of office hath been found against him, escheating the land to the government. In this position therefore I concur with the rest of the Court. As to those points touching which it is my misfortune to differ from them, I wish to be understood as entertaining great respect for their opinion, while I am constrained to adopt a different one as the result of my judgment.

Judgment reversed and cause remanded.

JUDGE WHITE, not sitting.